# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

ESTATE OF MICHAEL FRANK MARRUFO, *et al.*,

Plaintiffs,

v.

CITY OF BAKERSFIELD, *et al.*,

Defendants.

Case No. 1:24-cv-00274-CDB

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

(Doc. 21)

Pending before the Court[1] is the motion of Defendants City of Bakersfield, Jason Zamora Gonzalez, and Carlos Hernandez-Rodriguez (collectively, "Defendants") for summary judgment, separate statement of undisputed material facts, and request for judicial notice in support thereof, filed on October 27, 2025. (Docs. 21, 21-3, 21-4). On November 10, 2025, Plaintiffs Estate of Michael Frank Marrufo, Jennifer Marrufo, individually, and as successor in interest to decedent Michael Frank Marrufo ("Decedent" or "Mr. Marrufo"), G.H., V.H., and A.H., individually, and as successors in interest to Michael Frank Marrufo, by and through their guardian ad litem Jennifer Marrufo (collectively, "Plaintiffs") filed an opposition to Defendants' motion and to Defendants'

---

[1] On May 30, 2024, after the parties consented to the jurisdiction of a U.S. Magistrate Judge for all further proceedings pursuant to 28 U.S.C. § 636(c)(1), this action was reassigned to the undersigned. (Doc. 14).

separate statement of undisputed material facts. (Doc. 27, 27-1).  On November 18, 2025, Defendants filed a reply in further support of their motion for summary judgment and a response to Plaintiffs' opposition to Defendants' separate statement of undisputed material facts. (Docs. 28, 28-1).  The Court convened for a hearing on Defendants' motion on December 9, 2025.  (Doc. 31). For the reasons that follow, Defendants' motion for summary judgment will be granted.

## I.    Relevant Background

### A.    Relevant Procedural Posture

Plaintiffs initiated this action with the filing of a complaint against Defendants on March 5, 2024.  (Doc. 1).  Plaintiffs assert nine claims against Defendants alleging civil rights and related violations arising from an encounter between the Decedent and individual Defendants on July 18, 2023, during which Defendants allegedly engaged in unlawful and excessive use of force leading to Decedent's death.  (Doc. 1 ¶¶ 18-24).  On March 11, 2024, the Court granted Plaintiffs G.H., V.H., and A.H.'s petitions to appoint Plaintiff Jennifer Marrufo as guardian ad litem.  (Doc. 8).

Following a scheduling conference, on May 31, 2024, the Court entered the operative scheduling order setting forth discovery, motion and pretrial and trial dates and deadlines.  (Doc. 15).  The pretrial conference is scheduled for April 16, 2026, with trial to commence on July 22, 2026.  *Id.*  On November 19, 2025, the Court denied Plaintiffs' motion for leave to modify the scheduling order to amend the pleadings.  (Doc. 29).

### B.    Relevant Facts

The Court draws the following facts from the parties' joint statement of undisputed material facts (Doc. 21-2) and from other facts deemed undisputed by Plaintiffs (Doc. 27-1), except where noted.[2]  Defendants' statement of facts and Plaintiffs' response thereto both rely in part on footage from Defendants' Exhibits 3, 4, 5, and 7, which are various video files that were lodged with the Court.  *See* (Doc. 21-5, Declaration of Heather S. Cohen ("Cohen Decl.") ¶¶ 3-5, 7).  To the extent

---

[2] Defendants filed a reply to Plaintiffs' responses to Defendants' statement of facts.  *See* (Doc. 28-1).  No such filing is authorized by the Local Rules (*see* Local Rule 260), and, accordingly, the Court disregards Defendants' arguments therein.  In their filing, Defendants also reproduce Plaintiffs' separate statement of undisputed facts and assert various evidentiary objections.  *See id.* at 30-48.  Unless otherwise noted, these objections are overruled.  *See Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021).

material disputes exist as raised in the parties' briefing (*see* Docs. 27-1, 28-1), unless otherwise stated, the Court will look to the version most favorable to Plaintiffs as the non-moving party. *See Smith v. City of Hemet*, 394 F.3d 689, 693 (9th Cir. 2005).

1.    McDonald's Shooting Suspect Description and Search

On July 18, 2023, Defendants Bakersfield Police Department ("BPD") officers Jason Gonzalez Zamora and Carlos Hernandez Rodriguez ("Officers") were on patrol, in full police uniform, in a marked BPD vehicle when they received a call about a shooting incident that happened at a McDonald's located at 2699 Mount Vernon Avenue in Bakersfield. (Doc. 21-2, Undisputed Material Facts ("UMF") ¶ 1). The Officers were receiving regular updates as to what had transpired at the McDonald's. *Id.* ¶ 2.

The Officers received from dispatch varying descriptions of the shooting suspect, including: (1) a white male, heavy build, tattoos, wearing a tank top and yellow basketball shorts; (2) a Black or Hispanic male wearing a grey shirt with black sleeves; (3) a Hispanic male weighing about 250 pounds with black braids, tattoos on the right arm, wearing a baseball cap, gray tank top, red Nike shorts, black slides, and black socks; (4) a Hispanic male, about 200 pounds and muscular with black hair wearing a black shirt and black athletic shorts; and (5) a Hispanic male in his 40s or 50s, heavy build, with long black hair, tattoos on his face, neck, and arms, waring Nike athletic shorts.[3] (Doc. 27-1, Plaintiffs' Response to Defendants' Statement of Facts ("PRDSF") ¶ 1).

The Officers were advised that the shooting suspect had been dropped off on Columbus, which is an adjacent street to where the subject McDonald's was located. UMF ¶ 3. The Officers began to canvass the area looking for the shooting suspect, and as they were driving, they were advised that the victim of the shooting had sustained moderate to major injuries. *Id.* ¶¶ 4-5. The

---

[3] Although Plaintiffs dispute Defendants' contention that Officers Zamora and Rodriguez were advised that the suspect was a Hispanic male in a light-colored tank top and shorts with tattoos, there is no disputed issue of fact that Mr. Marrufo generally matched at least one of the descriptions that the suspect was a male, heavy build, with tattoos wearing a tank top. *See* (Doc. 21-5 at 9) (Ex. 1, Deposition of Jason Zamora Gonzalez ("Zamora Depo.") at 20) ("There was one update which stated that the suspect was a Hispanic male in a light-colored tank top and shorts."); *see id.* at 27 (Ex. 2, Deposition of Carlos Hernandez-Rodriguez ("Rodriguez Depo.") at 16) ("[W]e had the suspect information, which at the time was Hispanic male with tattoos wearing a light-colored gray tank top and some shorts.").

3

Officers drove westbound on Columbus attempting to locate the shooting suspect and then drove around the block in an attempt to cut the shooting suspect off at the other end of the alley, which would have been on North Kern Street. *Id.* ¶¶ 6-7. When the Officers reached the intersection of Columbus and River, they went into the neighborhood southwest of the intersection.[4] PRDSF ¶ 2. The Officers then proceeded southbound on North Baker Street when Officer Rodriguez observed a Hispanic male with tattoos wearing a tank top and shorts in the northern alley of the 600 block of Irene Street walking westbound. *Id.* ¶ 3.

### 2. Encounter with Mr. Marrufo

As the Officers entered the alleyway in their patrol vehicle, the individual they observed, later identified as Mr. Marrufo, immediately changed direction from walking westbound to jumping over a fence into the rear yard of the residence located at 606 Irene Street. *Id.* ¶ 4. Because Mr. Marrufo generally matched at least one of the descriptions of the shooting suspect, and the Officers observed Mr. Marrufo attempted to evade the police by jumping the fence after seeing the patrol vehicle, the Officers parked their patrol vehicle in the alleyway and exited the vehicle. *Id.* ¶ 5. The Officers observed that Mr. Marrufo had gone into the rear yard and had concealed himself behind an above-ground pool. *Id.* ¶ 6. The Officers ordered Mr. Marrufo to come out and Mr. Marrufo failed to comply. *Id.* ¶ 7.

Officer Zamora returned to the patrol vehicle with the intention of driving to the front of the Irene Street residence to establish a possible perimeter in case Mr. Marrufo attempted to flee again and also to have access to the vehicle once Mr. Marrufo was taken into custody. UMF ¶ 8. Meanwhile, Officer Rodriguez jumped over the fence to attempt to contact with Mr. Marrufo. *Id.* ¶ 9. Officer Rodriguez observed Mr. Marrufo laying on the ground with his hands underneath his torso before Officer Rodriguez gave commands for Mr. Marrufo to place his hands out and spread

---

[4] Plaintiffs dispute Defendants' contention that the neighborhood southwest of Columbus and River is a high-crime area, arguing that there is no evidence to support the claim. PRDSF ¶¶2. Because this discrepancy is not material to the Court's decision, and Plaintiffs are the non-moving party, the Court will disregard Defendants' contention. *See Smith*, 394 F.3d at 693.

them to ensure he did not have access to any weapons.[5]  *Id.* ¶¶ 10, 11; PRDSF ¶ 9.  Officer Rodriguez began asking Mr. Marrufo questions as to where he was coming from, where he lived, why he jumped the fence, and if he had any weapons on him.  UMF ¶ 12.

Officer Rodriguez observed that Mr. Marrufo's eyes were dilated so Officer Rodriguez was not sure if Mr. Marrufo was under the influence of a narcotic.[6]  PRDSF ¶ 8.  At this point, Officer Rodriguez had not taken Mr. Marrufo into custody because he did not know if Mr. Marrufo had a weapon and had not been able to search him.[7]  *Id.* ¶ 10.  Mr. Marrufo repeatedly told Officer Rodriguez that he had a heart condition to which Officer Rodriguez told Mr. Marrufo to "just relax" and "stop talking" at which point Mr. Marrufo began lifting his head up to look around before he stood up and ran toward the front of the house.[8]  *Id.* ¶ 11; UMF ¶ 13.  As Mr. Marrufo reached the front yard, he started to climb the chain link fence which separated the house and the street.  UMF ¶ 14.  Mr. Marrufo attempted to climb over the fence and made it approximately halfway up the fence before Officer Rodriguez grabbed Mr. Marrufo by the neck and torso and rotated him to the left with his head toward the ground.[9]  PRDSF ¶¶ 12, 14.  In deciding to prevent Mr. Marrufo from

---

[5] Plaintiffs do not dispute this fact but note that Officer Rodriguez did not "simply give commands" but was yelling at Mr. Marrufo throughout their encounter.  This dispute is not material to the Court's decision.

[6] Although Plaintiffs dispute that Officer Rodriguez checked Mr. Marrufo's eyes or looked closely at his eyes to notice they were dilated, the Nest Home Camera footage shows that Officer Rodriguez in fact made eye contact with Mr. Marrufo as he was prone on the ground.  *See* (Doc. 21-5, Ex. 4) (Nest Home Camera – IMG_3953 at 00:42-1:33).

[7] Plaintiffs do not dispute this fact, but assert that Officer Rodriguez had ample time and opportunity to search Mr. Marrufo.  The Nest Home Camera footage shows that following Officer Rodriguez's commands to put his hands up, Mr. Marrufo ignored Officer Rodriguez's question whether he had any weapons on him, was on the ground for approximately 50 seconds before he announced repeatedly for approximately 40 seconds that he had a bad heart, and ultimately got up and fled.  (Doc. 21-5, Ex. 4) (Nest Home Camera – IMG_3953 at 00:50-1:33).  Plaintiffs' dispute that Officer Rodriguez had ample time and opportunity to search Mr. Marrufo is unconvincing and immaterial to the Court's decision.

[8] Plaintiffs' dispute that Officer Rodriguez yelled at Mr. Marrufo to "stop fu**ing talking" is immaterial to the Court's decision.

[9] Plaintiffs dispute that Officer Rodriguez simply grabbed Mr. Marrufo and pulled him down.  Following review of the Nest Home Camera footage, and in the light most favorable to

getting over the fence, Officer Rodriguez considered that Mr. Marrufo was believed to be the suspect of a violent crime, that Mr. Marrufo had already fled and had not yet been searched for weapons, and Officer Rodriguez wanted to prevent any danger to his partner or other people in the neighborhood.[10]  *Id.* ¶ 13.  As Mr. Marrufo fell down, a firearm fell out of his waistband.  *Id.* ¶ 15.  Officer Rodriguez then grabbed Mr. Marrufo's arms and placed his right knee on Mr. Marrufo's face while calling for Officer Zamora.  *Id.* ¶ 16; *see* (Doc. 21-5, Ex. 7) (Officer Rodriguez body worn camera ("BWC") at 2:55-3:05).  Officer Rodriguez did not want Mr. Marrufo to be able to reach the firearm that had fallen out of Mr. Marrufo's pants.[11]  *Id.* ¶ 17.

### 3.    Request for Medical Aid

As Officer Zamora was driving to the front of the house, he became lost and did not know in which yard Officer Rodriguez encountered Mr. Marrufo.  *Id.* ¶ 18.  Officer Zamora then heard Officer Rodriguez call over to him and ran to the location where Mr. Marrufo was already on the ground.  UMF ¶ 15.  Officer Zamora assisted Officer Rodriguez place Mr. Marrufo into handcuffs.  *Id.* ¶ 16.  Officer Rodriguez radioed for medical aid approximately 48 seconds from the time Mr. Marrufo was handcuffed and was advised by dispatch that medical aid was "en route."[12]  PRDSF ¶

---

Plaintiffs, the Court adopts Plaintiffs' description of this fact.  *See Smith*, 394 F.3d at 693; (Doc. 21-5, Ex. 5) (Nest Home Camera – IMG_8746 at 0:10-0:17).

[10] Because Plaintiffs' challenge that Mr. Marrufo did not match any description of the shooting suspect is without merit (*see supra*), their dispute regarding whether Mr. Marrufo was believed to be the suspect of a violent crime is immaterial.

[11] Plaintiffs dispute the assertion that Mr. Marrufo was capable of reaching the firearm because Mr. Marrufo was "completely incapacitated and appeared nearly unconscious[,]" "was unable to move, and the firearm was located several feet away, making it physically impossible for him to reach it."  However, review of Officer Rodriguez's BWC shows what appears to be a firearm holster within reach above Mr. Marrufo's head as he was held down by Officer Rodriguez.  *See* (Doc. 21-5, Ex. 7) (Officer Rodriguez BWC at 2:54-3:04).  Although the video evidence shows Mr. Marrufo may be incapacitated, Plaintiffs' assertion that the firearm was impossible to reach does not create a genuine dispute of fact.

[12] Plaintiffs dispute Defendants' contention that Officer Rodriguez "immediately" radioed for medical aid following placing handcuffs on Mr. Marrufo.  Review of Officer Zamora's BWC supports Plaintiffs' representation that approximately 48 seconds elapsed from the time Mr. Marrufo was handcuffed to when Officer Rodriguez radioed for medical aid.  *See* (Doc. 21-5, Ex. 3) (Officer Zamora BWC at 3:30-4:20).

6

19. Officer Zamora noticed Mr. Marrufo was unconscious and had labored breathing before he placed Mr. Marrufo on his right side.[13]  *Id.* ¶ 20.  Mr. Marrufo was on his stomach for approximately 90 seconds prior to being turned to his right side.[14]  *Id.* ¶ 21.  Officer Zamora began administering sternum rubs on Mr. Marrufo, which did not appear to work.[15]  *Id.* ¶ 22.  Officer Zamora then attempted to sit Mr. Marrufo up in hopes he could get out of being unconscious and wake up.  *Id.* ¶ 23.  Officer Zamora further administered sternum rubs.  *Id.* ¶ 24.  The Officers could not hear Mr. Marrufo breathing and checked for his pulse, which they could not locate.  *Id.* ¶ 25.  Officer Zamora radioed to "expedite medical" and made a subsequent request for medical aid.  UMF ¶¶ 17, 18.  Officer Zamora then removed Mr. Marrufo's handcuffs and started chest compressions on Mr. Marrufo, after which Officer Zamora relieved him and did the same.  *Id.* ¶¶ 19-20.  Medical aid arrived as chest compressions were being performed, approximately 10 minutes and 38 seconds after being dispatched.[16]  *Id.* ¶ 21; PRDSF ¶ 26.

### 4.    Dr. Eugene Carpenter's Autopsy of Decedent Marrufo

An autopsy was performed by Dr. Eugene Carpenter from the Kern County Coroner's Office.  UMF ¶ 22.  Dr. Carpenter concluded that the cause of Mr. Marrufo's death was acute methamphetamine and 4-ANPP toxicity from drug intake.  *Id.* ¶ 23.  Dr. Carpenter identified that

---

[13] Plaintiffs do not dispute this fact but challenge that Mr. Marrufo was placed in a proper recovery position (PRDSF ¶ 20).  Although they do not cite evidence that supports this disputed fact, elsewhere, Plaintiffs refer to the report of their retained police practices expert, Roger Clark, who opines that the Officers did not properly place Mr. Marrufo in a recovery position.  *See* (Doc. 27-1, "Plaintiffs' Uncontroverted Facts" ["PUMF"] ¶ 80) (citing Doc. 27-2, Ex. J).

[14] Although Plaintiffs dispute the length of time Mr. Marrufo laid on his stomach before he was turned allegedly into a recovery position, review of the Nest Home Camera footage supports Defendants' characterization.  *See* (Doc. 21-5, Ex. 5) (Nest Home Camera – IMG_8746 at 0:42-2:15).

[15] The Court disregards Plaintiffs' assertion that Officer Zamora failed to properly conduct sternum rubs because they rely exclusively on the video evidence without advancing any cogent argument or identifying any other record evidence in support thereof.

[16] Defendants' characterization that medical aid arrived within seven minutes of being dispatched is inconsistent with the record evidence.  *See* (Doc. 21-5, Ex. 3) (Officer Zamora BWC at 4:17-14:55).

Mr. Marrufo had massive hypertrophic heart disease with cor pulmonale also contributing to his death. *Id.* ¶ 24.

Dr. Carpenter confirmed that head and neck trauma did not play a role in Mr. Marrufo's death.[17] PRDSF ¶ 27. Dr. Carpenter also concluded that the amount of time Mr. Marrufo was on his stomach was not overly prolonged.[18] *Id.* ¶ 28. Dr. Carpenter did not render any opinion in the autopsy report or in his deposition that any delay in medical treatment caused or contributed to Mr. Marrufo's death. *Id.* ¶ 42.

5.    BPD Policies and POST Standards

At the time of the incident, BPD used policies developed by Lexipol, a commercial company that provides policies and procedures for police departments in California, which included, among others, "Policy 300—Use of Force Policy" which includes guidelines on the use of force, factors to determine the reasonableness of force, and alternatives to the use of force, and "Policy 301—Handcuffing and Restraints." UMF ¶ 28. Policy 300.7 directs officers to promptly provide or procure medical assistance for any person injured or claiming to have been injured in a use of force incident. *Id.* ¶ 29.

The Use of Force policy includes a section on "additional restrictions" which specifically references the issue of "positional asphyxia" and "restraint asphyxia" and provides that "officers are not authorized to use any restraint or transportation method which might unreasonably impair an individuals breathing or respiratory capacity for a period beyond the point when the individual

---

[17] Because Dr. Carpenter testified that head and neck trauma did not play a role in the death of Mr. Marrufo, Plaintiffs' attempt to dispute this fact in relying on Dr. Carpenter's testimony—regarding head impact or trauma as capable in a hypothetical situation of indirectly contributing to death—does not create a genuine dispute of material fact relating to the cause of death. *See* (Doc. 21-5 at 69) (Ex. 9, Deposition of Eugene Carpenter ("Carpenter Depo.") at 21).

[18] Plaintiffs attempt to dispute this fact, relying on Dr. Carpenter's testimony about a hypothetical in which a danger of lactic acid buildup and insufficient oxygen can lead to death. However, because Dr. Carpenter testified that there was no sign of positional asphyxia here, and leaving a person on their abdomen for "[t]wo minutes [is] okay" as Mr. Marrufo did not have an excessively obese abdomen, Plaintiffs do not create a genuine dispute of material fact relating to the effects of Mr. Marrufo's positioning on his stomach. *See* Carpenter Depo. at 36, 37, 41-42.

has been adequately and safely controlled" and that "[o]nce controlled, the individual should be placed into a recovery position and monitored for signs of medical distress." PRDSF ¶ 31.

At the time of the incident, BPD observed and trained to the standards set by POST. Among the requirements for an agency to obtain POST-Certification, it must agree to abide by POST standards and only employ POST-certified officers.[19] *Id.* ¶ 32. BPD observes POST training standards and provides internal training through the publications, bulletins, and other training material. *Id.* ¶ 34. BPD's training is consistent with POST mandates. *Id.* ¶ 35. At the time of the incident, every BPD officer had completed a POST-certified training academy prior to becoming a police officer. *Id.* ¶ 36. At the time of the incident, Officers Rodriguez and Zamora had attended and successfully completed the POST certified academy and were trained both in the police academy and subsequently on use of force and on first aid. *Id.* ¶¶ 37, 38.

Plaintiffs designated a retained expert, Roger Clark, as a police procedures expert. *Id.* ¶ 39. Mr. Clark is not a medical expert and is not qualified to render any medical opinions on causation. *Id.* ¶ 40.

### 6.    Plaintiffs' Declarations under Cal. Code of Civ. Proc. § 377.32

On November 10, 2025, Plaintiffs filed declarations pursuant to Cal. Civ. Proc. Code § 377.32 that each individual Plaintiff is Decedent's successor in interest as defined in Cal. Civ. Proc. Code §§ 377.11 and 377.60. *See* (Docs. 23-26); PRDSF ¶ 43.

## II.    Governing Authority

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Washington Mutual Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).

---

[19] Plaintiffs dispute that BPD observed and trained to the standards set by POST at the time of the incident, relying on various statistics from a 2023 Personnel Complaint Annual Review of BPD.

On summary judgment, each party's position must be supported by: (1) citing to particular portions of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. *See* Fed. R. Civ. P. 56(c)(1). The court may consider other materials in the record not cited to by the parties, but it is not required to do so. *See* Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). Furthermore, "[a]t summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial." *Nevada Dep't of Corr v. Greene*, 648 F.3d 1014, 1019 (9th Cir. 2011) (citations and internal quotations omitted). The focus is on the admissibility of the evidence's contents rather than its form. *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004).

"The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets this initial burden, the burden then shifts to the non-moving party "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387 (citing *Celotex Corp.,* 477 U.S. at 323). The non-moving party must "show more than the mere existence of a scintilla of evidence." *Id.* (citing *Anderson,* 477 U.S. at 252). However, the non-moving party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation and citation omitted).

"[A] court ruling on a motion for summary judgment may not engage in credibility determinations or the weighing of evidence." *Manley v. Rowley,* 847 F.3d 705, 711 (9th Cir. 2017)

(citation omitted).  The evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party.  *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 772 (9th Cir. 2002); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

Finally, "[t]he mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage."  *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018).  "The record is viewed in the light most favorable to the nonmovants … so long as their version of the facts is not blatantly contradicted by the video evidence[.]"  *Id.* (citation omitted); *see Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022) ("[F]or purposes of ruling on a motion for summary judgment, a district court may properly view the facts in the light depicted by bodycam footage and its accompanying audio, to the extent the footage and audio *blatantly* contradict testimonial evidence.") (emphasis in original).

### III.    Defendants' Unopposed Request for Judicial Notice

Defendants request the Court judicially notice the docket of this action as of October 27, 2025.  (Doc. 21-4).  The Court denies this request because it is unnecessary to take judicial notice of materials already of record in the case.  *See Clee v. Benson Indus., Inc.*, No. 2:24-cv-01529-DAD-AC, 2024 WL 4462337, at *2 (E.D. Cal. Sept. 30, 2024) (citing cases); *see also Phillips v. Irvine Co. LLC*, No. 8:23-cv-00622-CAS-BFM, 2023 WL 5504993, at *1 (C.D. Cal. July 19, 2023) ("The parties are requested not to submit a separate request for judicial notice any time they reference the docket in this action. Unless otherwise stated, the Court will always take judicial notice of its own docket.").

### IV.    Discussion

In the operative complaint, Plaintiffs assert the following claims under 42 U.S.C. § 1983: (1) excessive force under the Fourth Amendment; (2) failure to provide medical care under the Fourth Amendment; (3) interference with familial relationship under the Fourteenth Amendment; and (4) municipal liability under *Monell* for unconstitutional policies, customs, or practices.  *See* (Doc. 1 at 6-15).  Under state law, Plaintiffs assert claims for negligence causing wrongful death,

11

assault and battery causing wrongful death, false arrest/imprisonment, violation of the Ralph Act (Cal. Civ. Code § 51.7), and violation of the Bane Act (Cal. Civ. Code § 52.1). *See id.* at 16-26.

Defendants move for summary judgment on all claims. (Doc. 21 at 2).

Turning first to the claims brought pursuant to federal law, the Civil Rights Act provides:

> Every person who, under color of [state law] ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution ... shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

42 U.S.C. § 1983. To prevail on a § 1983 claim, a plaintiff must prove that the conduct complained of was committed by a person acting under color of state law and that this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or the laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–95 (1978).

The Court preliminarily addresses Defendants' arguments regarding standing before addressing Plaintiffs' claims under § 1983.

**A.    Standing**

1.    Parties' Contentions

Defendants argue Plaintiffs lack standing to make any successor in interest claim. (Doc. 21 ¶ 1). Defendants contend Plaintiffs' failure to file the required affidavits or declarations satisfying Cal. Civ. Proc. Code § 377.32 by any Plaintiff results in a lack of standing to allege any successor in interest claim. (Doc. 21-1 at 16).

Plaintiffs contend that Defendants' arguments that Plaintiffs lack standing is moot as Plaintiffs have executed and filed the required successor-in-interest declarations pursuant to § 377.32, which include all statutorily required statements and certified copies of Decedent's death certificate. (Doc. 27 at 12). Defendants do not reply to or otherwise address Plaintiffs' belated filing of the declarations. *See* (Doc. 28).

2.    Governing Authority

"[T]he general rule is that only the person whose Fourth Amendment rights were violated can sue to vindicate those rights." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369

12

(9th Cir. 1998), *as amended* (Nov. 24, 1998) (citing 42 U.S.C. § 1988(a)).  "In § 1983 actions, however, the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action."  *Id.*  "The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival action and that the plaintiff meets that state's requirements for bringing a survival action."  *Id.*

In California, "a cause of action for or against a person is not lost by reason of the person's death[] but survives subject to the applicable limitations period."  *Galindo v. City of San Francisco*, 718 F. Supp. 3d 1121, 1130 (N.D. Cal. 2024) (citing Cal. Civ. Proc. Code § 377.20(a)).  "A cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest ... and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest."  *Id.* (citing Cal. Civ. Proc. Code § 377.30; *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1229 (9th Cir. 2013) ("California's statutory requirements for standing to bring a survival action are stated under California Code of Civil Procedure § 377.30.")).

"According to California law, to proceed as a decedent's 'successor in interest' individuals must 'execute and file an affidavit or a declaration under penalty of perjury under the laws of this state.'"  *Id.* (citing Cal. Civ. Proc. Code § 377.32).  "The affidavit or declaration must include, among other things, the decedent's name, a statement '[n]o proceeding is now pending in California for administration of the decedent's estate,' a statement indicating the affiant is the decedent's successor in interest or authorized to act on behalf of the decedent's successor in interest and '[n]o other person has a superior right to commence the action or proceeding or to be substituted for the decedent in the pending action or proceeding,' and a certified copy of the decedent's death certificate."  *Id.*

### 3. Analysis

Here, Plaintiffs' declarations filed on November 10, 2025, satisfy the requirements of § 377.32 such that each individual Plaintiff has standing to proceed as Decedent's successor in interest.  *See* (Docs. 23-26).

Additionally, although individual Plaintiffs' declarations were filed after the two-year statute of limitations expired as their claims accrued on Decedent's death on July 18, 2023, "their claims are timely pursuant to the relation back doctrine." *Galindo*, 718 F. Supp. 3d at 1131; *see Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1059 (9th Cir. 2018) ("Because § 1983 has no specific statute of limitations, federal courts borrow state statute of limitations for personal injury actions."); Cal. Civ. Proc. Code § 335.1 (two-year personal injury statute of limitations in California). Under Federal Rule of Civil Procedure 15, an amendment to a pleading "relates back to the date of the original pleading when … the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). "Plaintiffs' [] claims remain the same as the claims in their original pleadings" and "Defendants are not prejudiced by Plaintiffs' belated filing of the required declaration[s]." *Galindo*, 718 F. Supp. 3d at 1131. Therefore, Plaintiffs' declarations relate back to Plaintiffs' complaint, and each individual Plaintiff's claims on behalf of Decedent are not barred by the statute of limitations. *See Hayes v. Cnty. of San Diego*, No. 07-cv-1738 DMS (JMA), 2014 WL 11878351, at *3 (S.D. Cal. Apr. 3, 2014) ("The only difference between the claims is Plaintiff has now submitted the requisite declaration under [] § 337.32. Under these circumstances, Defendants cannot, and indeed they do not, claim they have been prejudiced by Plaintiff's belated filing of the Declarations. Plaintiff has met the requirements of Rule 15(c)(1)(B), and thus her claim, as amended by the Declarations, relates back to the original Complaint. With this finding, Defendants are not entitled to summary judgment on the issue of Plaintiff's standing to pursue the Fourth Amendment claim."). Therefore, Defendants' arguments as to Plaintiffs' lack of standing are moot and Defendants' motion seeking summary judgment on this ground fails.

**B.    Fourth Amendment Excessive Force Claim**

1.    Parties' Contentions

Defendants contend Plaintiffs' excessive force claims fail as a matter of law because there is no evidence that any Defendant used unreasonable or unlawful force and there is no evidence that any alleged use of force caused Decedent's death. (Doc. 21-1 at 16). Defendants argue that the Officers' use of force was not excessive nor unreasonable under the circumstances, the quantum

of contact between the Officers and Decedent was low-level and minimal, and the force used was not the proximate cause of Decedent's death or injuries. *Id.* at 16-19.

Plaintiffs assert that the record establishes sufficient evidence for a jury to find that Defendants used excessive force and that such force caused Decedent's death. (Doc. 27 at 12).

2.    Governing Authority

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. Amend. IV. Under the Fourth Amendment, a claim asserting that a law enforcement officer used excessive force during the course of an arrest, investigatory stop, or other seizure of a citizen is analyzed under the objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Under that standard, "'[t]he force which [i]s applied must be balanced against the need for that force: it is the need for force which is at the heart of the *Graham* factors.'" *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997) (quoting *Alexander v. City and Cnty. of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994), *abrogated on other grounds by County of Los Angeles v. Mendez*, 581 U.S. 420 (2017)). Courts are required to "balance the nature of the harm and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010) (citations and quotations omitted). "Force is excessive when it is greater than is reasonable under the circumstances." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). "Courts consider the totality of the circumstances, including '(1) the 'severity of the crime at issue,' (2) whether the suspect 'poses an immediate threat to the safety of the officers or others,' and (3) whether the suspect 'is actively resisting arrest or attempting to evade arrest by flight.'" *Galindo*, 718 F. Supp. 3d at 1132 (citing *Peck v. Montoya*, 51 F.4th 877, 887 (9th Cir. 2022)). Courts may also consider "the availability of less intrusive alternatives to the force employed and whether warnings were given." *Hopson v. Alexander*, 71 F.4th 692, 698 (9th Cir. 2023).

However, under the doctrine of qualified immunity, police officers are not liable under § 1983 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness

15

of their conduct was 'clearly established at the time.'" *D.C. v. Wesby*, 583 U.S. 48, 49 (2018).  In its qualified immunity analysis, a court may use either prong as its starting point and, thus, exercise its "discretion to resolve a case only on the second ground when no clearly established law shows that the officers' conduct was unconstitutional." *O'Doan v. Sanford*, 991 F.3d 1027, 1036 (9th Cir. 2021).

Under the first prong of the qualified immunity analysis, "whether a constitutional right was violated … is a question of fact."  *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1085 (9th Cir. 2009); *see Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022) (explaining that under the first prong of the qualified immunity analysis, the court considers whether the facts show a violation of a constitutional right).  In contrast, "the 'clearly established' inquiry is a question of law that only a judge can decide." *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017); *see Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2018).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent," meaning "it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *Wesby*, 583 U.S. at 63 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011)).  Stated differently, "[a] right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rosenbaum v. City of San Jose*, 107 F.4th 919, 924 (9th Cir. 2024) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021)) (citation omitted).  A § 1983 plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct. *Hopson*, 71 F.4th at 708 ("There is no analogous burden on § 1983 defendants to find factually on-point cases clearly establishing the lawfulness of an officer's actions.  Nor must § 1983 defendants come forward with precedent showing that the unlawfulness of their conduct was not clearly established."); *Emmons v. City of Escondido*, 921 F.3d 1172, 1174 (9th Cir. 2019); *see Rivas-Villegas*, 595 U.S. at 6 (burden is with plaintiff to identify precedent "that put [defendant] on notice that his specific conduct was unlawful").

"For a constitutional right to be clearly established, a court must define the right at issue with specificity and not … at a high level of generality." *Gordon v. Cnty. of Orange*, 6 F.4th 961,

968 (9th Cir. 2021) (internal quotations and citation omitted). When identifying the right that was allegedly violated, a court must define the right more narrowly than the constitutional provision guaranteeing the right, but more broadly than all of the factual circumstances surrounding the alleged violation. *See Watkins v. City of Oakland, Cal.*, 145 F.3d 1087, 1092–93 (9th Cir. 1998). "The Supreme Court has 'repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage of litigation." *Dunn v. Castro*, 621 F.3d 1196, 1199 (9th Cir. 2010) (quoting *Hunter v. Bryant,* 502 U.S. 224, 227 (1991)).

"Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015)) (per curiam). In other words, a plaintiff bringing "excessive force claims must thus point to an existing rule that squarely governs the facts at issue and that moves the officer's actions outside the hazy border between excessive and acceptable force." *Hopson*, 71 F.4th at 698 (citing *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004)).

3.    Analysis – Constitutional Violation

In resolving whether Defendant Officers are entitled to qualified immunity, the Court must engage in the relevant two-step inquiry. The Court first "ask[s] whether the facts, viewed in the light most favorable to the [Plaintiff[s], demonstrate that the [Officers] violated a constitutional right." *Peck*, 51 F.4th at 887 (citation omitted). Next, the Court asks "whether that right was 'clearly established' at the time of the alleged constitutional violation." *Id.*

As to Plaintiffs' excessive force claims against Officers Rodriguez and Zamora, the Court will begin by considering the first prong of the qualified immunity analysis, namely, whether Officers Rodriguez and Zamora's conduct violated a constitutional right.

*Remainder of This Page Intentionally Left Blank*

17

a.    *Quantum of contact*

In their complaint and in opposing summary judgment, Plaintiffs characterize the force used by the Officers as "deadly force" because it "posed a substantial risk of causing death or serious bodily injury." (Doc. 1 ¶¶ 65, 76; Doc. 27 at 14, 16).[20]

"To classify the force used, we consider the specific circumstances of the case. [citation omitted] 'Both the nature and degree of physical contact and the risk of harm and the actual harm experienced are relevant.'" *Scott v. Smith*, 109 F.4th 1215, 1223 (9th Cir. 2024) (quoting *Seidner v. de Vries*, 39 F.4th 591, 597 (9th Cir. 2022)). "Deadly force is force that 'creates a substantial risk of causing death or serious bodily injury.'" *Id.* (citing *Smith*, 394 F.3d at 706). "The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a fundamental interest in his own life and because such force frustrates the interest of the individual and of society, in judicial determination of guilt and punishment." *A. K. H by & through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (citation and quotations omitted). "An officer's use of deadly force is reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (emphasis omitted) (citation and quotation omitted).

In support of their contention that Officer Rodriguez employed deadly force when he grabbed Mr. Marrufo from the fence by the neck and torso and forcibly threw him head-first to the ground, Plaintiffs rely largely on the surveillance camera and BWC footage that captures the incident (*see* Doc. 27 at 14, 16, citing PUMF ¶¶ 60-66). However, they fail to cite any authority for the proposition that a take-down maneuver of the type employed here by Officer Rodrigez constitutes deadly force. To the contrary, courts addressing similar types of excessive force claims arising from a violent take-down of a suspect by law enforcement officers find that such force amounts to something less than "deadly force," such as a "significant" or "substantial" use of force. *See Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021) (officers' tripping and throwing

---

[20] Plaintiffs' allegations in the complaint regarding deadly force only appear in their state law claims for negligence and assault and battery causing wrongful death, which allegations are not incorporated in the allegations of the § 1983 claims.

plaintiff face-first onto the pavement constituted a "substantial" and "aggressive use" of force); *Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007) (impact blows by punching or kicking deemed significant or intermediate force capable of inflicting significant pain and causing serious injury); *Aranda v. City of McMinnville*, 942 F. Supp. 2d 1096, 1105 (D. Or. 2013) (using closed fist and knee to deliver multiple focused blows to the plaintiff's head, shoulder, and side deemed a significant use of force).  The mere fact that the type of force at issue here is capable of causing serious injury or death is not the operative inquiry – rather, it is whether the force created a substantial risk of death or serious bodily injury.  *See Glenn v. Washington Cnty.*, 673 F.3d 864, 871-72 (9th Cir. 2011) (noting that while a beanbag shotgun can cause serious injury or death, its employment constitutes "less than deadly" force) (citation omitted); *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (same for baton blows).

The BWC footage of the incident (the only evidence relied upon by Plaintiffs), even construed in the light most favorable to Plaintiffs, does not create a triable issue that Officer Rodriguez's actions constituted the employment of deadly force.  Instead, based on the authorities cited above, the Court concludes that Officer Rodriguez's actions constitute a significant use of force.

                    b.        *Severity of the crime at issue*

The first, nonexclusive *Graham* factor is the severity of the crime at issue.  "The 'character of the offense' committed by the suspect is also often an important consideration in determining whether the use of force was justified."  *Glenn v. Washington Cnty.*, 673 F.3d 864, 874 (9th Cir. 2011) (citation and quotation omitted).

Here, the Officers were investigating a shooting incident at a nearby McDonald's and reasonably believed Mr. Marrufo may be the suspect.  PRDSF ¶ 1; *see* (Doc. 21-5 at 9) (Ex. 1, Zamora Depo. at 20) ("There was one update which stated that the suspect was a Hispanic male in a light-colored tank top and shorts."); *see id*. at 27 (Ex. 2, Rodriguez Depo. at 16) ("[W]e had the suspect information, which at the time was Hispanic male with tattoos wearing a light-colored gray tank top and some shorts.").  Although it was unknown at the time whether Mr. Marrufo was in fact the shooting suspect or whether he possessed any weapons and posed an immediate threat, the

Officers observed Mr. Marrufo attempting to evade the police in jumping over a fence into the backyard of a residence and refusing to comply to commands to come out. He ultimately rose from a prone position against Officer Rodriguez's commands and attempted to escape. Under the circumstances, the Officers were investigating a felony shooting and observed a potential matching suspect attempt to flee from the area while ignoring their commands. Therefore, this factor weighs in Defendants' favor as the crime at issue involved a violent felony.

c.    *Whether Decedent posed an immediate threat and was attempting to evade or resist arrest*

As the facts relating to the second and third *Graham* factors are intertwined, the Court will consider these two factors together.

It is undisputed that Mr. Marrufo fled upon seeing the Officers and following his initial encounter with Officer Rodriguez. *See* (Doc. 27 at 14-15). Officer Rodriguez was unable to verify whether Mr. Marrufo had any weapons or posed an immediate threat given Mr. Marrufo twice ran from the police and did not answer Officer Rodriguez's questions about whether he had any weapons on him or why he jumped the fence. UMF ¶ 12; PRDSF ¶ 10. Officer Rodriguez was unable to verify whether Mr. Marrufo had any weapons on him until after Mr. Marrufo was apprehended from the fence at the front of the house. However, at the time Officer Rodriguez rotated Mr. Marrufo from the fence headfirst into the ground, Mr. Marrufo appeared to be struggling to get over the fence, was not making and did not appear to present any immediate threat and was not brandishing any weapon. Therefore, Mr. Marrufo did not pose an immediate threat but was attempting to evade or resist arrest at the time Officer Rodriguez employed the force used against Mr. Marrufo.

d.    *Causation*

"In a § 1983 action, the plaintiff must also demonstrate that the defendant's conduct was the actionable cause of the claimed injury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). "To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation." *Id.* (citing *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996); *Arnold v. IBM Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981)). "[P]roximate cause exists

where 'an act or omission played a substantial part in bringing about or actually causing the injury or damage to plaintiffs[.]" *Id.*

Here, any force used by Officers Rodriguez and Zamora was not the proximate cause of Mr. Marrufo's death. Dr. Carpenter concluded from the autopsy of Mr. Marrufo that his cause of death was acute methamphetamine and 4-ANPP toxicity from drug intake. UMF ¶¶ 22, 23. Dr. Carpenter identified that Mr. Marrufo had massive hypertrophic heart disease with cor pulmonale also contributing to his death. *Id.* ¶ 24. Dr. Carpenter confirmed that any head and neck trauma did not play a role in Mr. Marrufo's death, and did not opine that any delay in medical treatment caused or contributed to Mr. Marrufo's death. PRDSF ¶¶ 27, 42.

Plaintiffs largely point to Dr. Carpenter's responses to counsel's questions during deposition about hypothetical scenarios and argue that his answers cumulatively support an alternative cause of death – that the Officers "created a dangerous environment that contributed to the fatal physical strain experienced by Mr. Marrufo." (Doc. 27 at 18). For instance, Plaintiffs note that Dr. Carpenter agreed that a hypothetical person that is handcuffed and placed on their abdomen while struggling with law enforcement might develop excessive lactic acid buildup due to insufficient oxygen, which might lead to death. But there is no evidence that such a set of circumstances occurred here. To the contrary, Dr. Carpenter testified that there was no sign of positional asphyxia and that leaving a person on their abdomen for "[t]wo minutes [is] okay" as Mr. Marrufo did not have an excessively obese abdomen. Carpenter Depo. at 36, 37, 41-42.

Because Plaintiffs are unable to point to any expert testimony or evidence of record to raise a genuine dispute of material fact as to whether Officers Rodriguez and/or Zamora's actions in pulling Mr. Marrufo from the fence headfirst onto the ground caused or contributed to his death, Plaintiffs fail to present any triable issue that Defendants' conduct was the actionable cause of the claimed injury. *Harper*, 533 F.3d at 1026. *Cf Kagawa v. Cnty. of Hawai'i Police Dep't*, No. 23-00105 MWJS-KJM, 2025 WL 2549289, at *8 (D. Haw. Sept. 4, 2025) (summary judgment granted where excessive force plaintiff failed to offer expert evidence refuting defendants' expert evidence that police officers' conduct did not cause the injuries alleged) with *Wells v. City of Las Vegas*, No. 2:21-CV-1346 JCM (EJY), 2024 WL 2028007, at *9 (D. Nev. May 7, 2024) (summary judgment

denied where parties' experts disagreed whether officers' placing decedent in a prone restraint position contributed to or was a significant factor in his death) and *Reaza v. Cnty. of Riverside*, No. 5:20-cv-01188-MEMF (SPx), 2022 WL 18396015, at *14 (C.D. Cal. Oct. 26, 2022) (summary judgment denied where parties' experts disputed whether decedent's death was caused by methamphetamine intoxication or officer's placing decedent in a hobble restraint).

Therefore, summary judgment is warranted given Plaintiffs' failure to demonstrate that Defendants' actions caused Decedent's injury. *See Stoner v. Does, 1-10*, 830 Fed. Appx. 547, 548 (9th Cir. 2020) (a jury "necessarily did not find a constitutional violation" where it unanimously found defendant officers engaged in excessive force, but that such force was not the proximate cause of the plaintiff's injuries); *Kagawa*, 2025 WL 2549289, at *8.

\*    \*    \*    \*    \*

In sum, drawing all reasonable inferences from the record in Plaintiffs' favor, even if there were genuine disputes of material fact that Officer Rodriguez's use of force was unreasonable and excessive, because Plaintiffs are unable to establish that Defendants' conduct was the proximate cause of Mr. Marrufo's death, the Court concludes a reasonable jury could not find that Defendants violated the Fourth Amendment in using excessive force against Mr. Marrufo. *See Anderson*, 477 U.S. at 249–50 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party … If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.") (citations omitted).

### 4. Analysis – Qualified Immunity

As the Court has concluded that no reasonable juror could find that Officers Rodriguez and Zamora violated Decedent's constitutional rights in connection with the seizure of Decedent based on a lack of causation, the Court need not reach the issue of qualified immunity. Nonetheless, in the alternative, the Court finds that, even if Defendants Rodriguez and Zamora violated Decedent's constitutional rights, they would be entitled to qualified immunity.

Plaintiffs bear the burden of proof to show that the rights allegedly violated were clearly established at the time of the alleged misconduct. *See Hopson*, 71 F.4th at 708. "This burden is especially heavy in excessive force cases where it is difficult for an officer to determine how the

22

relevant legal doctrine will apply to the factual circumstances he confronts, and consequently, clearly established law must be defined with particular specificity." *Carmona-Perez v. City of Salem*, No. 6:20-cv-00186-IM, 2023 WL 6216167, at *9-10 (D. Or. Sept. 25, 2023) (citing *Mullenix*, 577 U.S. at 12.

Plaintiffs identify four cases in support of their argument that it was clearly established that officers cannot use excessive force against a suspect who poses no immediate threat. (Doc. 27 at 22). The four cases were decided by the Ninth Circuit before 2023, the year of the incident, and thus are relevant here for purposes of putting law enforcement officers on notice.

In *Tennessee v. Garner*, the Supreme Court held that the "use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. … Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." 471 U.S. 1, 11 (1985). *Garner* involved an officer's use of deadly force in shooting an unarmed suspect in the back of the head who began to climb over a fence to elude capture. *Id.* at 4. Here, taking the facts before the Court in the light most favorable to Plaintiffs, *Garner* is not sufficiently analogous to the situation confronting Officers Rodriguez and Zamora in the seizure of Mr. Marrufo by way of using physical force to prevent his escape. Although the Court has found that the force Officers Rodriguez and Zamora used constitutes a significant use of force, it falls far below the deadly force at issue in *Garner*. It follows that Officers Rodriguez and Zamora were not on notice that their conduct in seizing Mr. Marrufo by physically removing him from a fence could violate the Constitution. *See Kisela*, 584 U.S. at 104-05 ("Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent '*squarely governs*' the specific facts at issue.") (emphasis added); *Plumhoff v. Rikard*, 572 U.S. 765, 778-79 (2014) ("[A] defendant [officer] cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."). Moreover, *Garner* "did not consider the issue of qualified immunity, as

the individual officers had already been dismissed from the case and the Supreme Court considered only the issue of the city's liability under *Monell*." *Galindo*, 718 F. Supp. 3d at 1142.

Similarly, Plaintiffs' citation to *Graham*, *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2000) and *Headwaters Forest Defense v. Cnty. of Humbolt*, 240 F.3d 1185, 1199 (9th Cir. 2000) are unconvincing to show that Officers Rodriguez and Zamora were on notice that their conduct could violate the Constitution. It is plain under *Graham* that an objective reasonableness standard is used to assess excessive force cases without regard to an officer's underlying intent or motivation. *Graham*, 490 U.S. at 397. Yet, Plaintiffs make no attempt to analogize the facts and circumstances at issue here to those in *Graham* and fail to develop any argument about how that case undermines Defendants' claim to qualified immunity. Additionally, *Graham* "also did not consider qualified immunity." *Galindo*, 718 F. Supp. 3d at 1142. Therefore, Plaintiffs cannot rely on *Graham* to meet their burden of showing that the rights allegedly violated were clearly established. *Quinto-Collins v. City of Antioch*, 718 F. Supp. 3d 1033, 1052 (N.D. Cal. 2024) (citing *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017)).

*Haskin*, which involved "purposeful sexual verbal and physical predation against a handcuffed arrestee[,]" is not sufficiently analogous to the situation involving Officers Rodriguez and Zamora and could not place the Officers on notice that their conduct was unlawful. *Haskin*, 262 F.3d at 880-81. *Headwaters Forest Defense*, which involved the use of pepper spray on protestors, is factually inapposite to the instant case and likewise fails to place Officers Rodriguez and Zamora on notice that their conduct violated Decedent's clearly established rights. *Headwaters Forest Defense*, 240 F.3d at 1199-1201.

Resolving all disputes in the light most favorable to Plaintiffs, because they have not carried their burden of identifying existing precedent that "'squarely governs' the specific facts at issue," Defendants are entitled to qualified immunity. *See Rosenbaum*, 107 F.4th at 924 (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)) (citation omitted).

///

///

///

24

**C.      Fourth Amendment Failure to Provide Medical Care Claim**

1.      Parties' Contentions

Defendants contend the Officers fulfilled their obligations under the Fourth Amendment by summoning emergency medical care, and there is no evidence from which any jury could conclude that Defendants failed to provide reasonable post-seizure care.  (Doc. 21-1 at 20).  Defendants further assert that Plaintiffs' claim here fails as there is no evidence that the Officers' conduct relative to the summoning of medical care caused Decedent's death.  *Id.* at 21.  Defendants argue that because there is no expert who has been designated to testify that any alleged delay contributed to Decedent's death, Plaintiffs are unable to raise a triable issue of material fact and Defendants are therefore entitled to judgment as a matter of law on this claim.  *Id.*

Plaintiffs contend that genuine issues of material fact exist as to whether Defendants failed to provide medical care in violation of the Fourth Amendment.  (Doc. 27 at 18).  Plaintiffs argue that although Officer Rodriguez called for medical care, he and Officer Zamora failed to provide proper medical care for Mr. Marrufo while waiting for paramedics to arrive and the Officers delayed in placing Mr. Marrufo in a recovery position or to do so correctly.  *Id.* at 19.  Plaintiffs contend Officer Zamora failed to perform sternum rubs on Mr. Marrufo properly.  *Id.*

2.      Governing Authority

"The Constitution has been interpreted to require state actors to provide adequate medical care in certain circumstances when the government is confining a person or otherwise restricting his liberty."  *D'Braunstein v. Cal. Highway Patrol*, 131 F.4th 764, 768 (9th Cir. 2025) (citing *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 851 (1998) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.")).

In *Tatum v. City & Cnty. of San Francisco*, the Court of Appeals reiterated that suspects have a Fourth Amendment right to "objectively reasonable post-arrest [medical] care" until the end of the seizure. 441 F.3d 1090, 1099 (9th Cir. 2006).  "This means that officers must 'seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a

hospital.'" *Est. of Cornejo ex rel. Solis v. City of Los Angeles*, 618 Fed. Appx. 917, 920 (9th Cir. 2015) (citing *Tatum*, 441 F.3d at 1099) (quoting *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986)). "But this does not 'require an officer to provide what hindsight reveals to be the most effective medical care for an arrested suspect.'" *D'Braunstein*, 131 F.4th at 768 (citing *Tatum*, 441 F.3d at 1098).

### 3. Analysis – Constitutional Violation

Here, Officer Rodriguez radioed for medical aid approximately 48 seconds from the time Mr. Marrufo was handcuffed on the ground and was advised by police dispatch that medical aid was "en route." PRDSF ¶ 19; *see* (Doc. 21-5, Ex. 3) (Officer Zamora BWC at 3:30-4:20). While waiting for medical aid to arrive, Officer Zamora noticed Mr. Marrufo was unconscious and had labored breathing, proceeded to place Mr. Marrufo on his right side, began administering sternum rubs on Mr. Marrufo, and attempted to sit Mr. Marrufo up. *Id.* ¶¶ 20, 22, 24. After Officers Rodriguez and Zamora could not locate Mr. Marrufo's pulse, Officer Zamora requested dispatch to expedite medical, made a subsequent request for medical aid, and removed Mr. Marrufo's handcuffs. *Id.* ¶ 25; UMF ¶¶ 17-19. Officers Rodriguez and Zamora both administered chest compressions on Mr. Marrufo until medical aid arrived approximately 10 minutes and 38 seconds from the time of Officer Rodriguez's initial request to dispatch. UMF ¶¶ 20, 21; PRDSF ¶ 26; *see* (Doc. 21-5, Ex. 3) (Officer Zamora BWC at 4:17-14:55).

Taken in the light most favorable to Plaintiffs, the evidence unquestionably establishes that Officers Rodriguez and Zamora promptly summonsed medical care within minutes after handcuffing Mr. Marrufo. None of the Officers' conduct cited by Plaintiffs contradict that the Officers promptly summonsed medical care following the Officers' placement of handcuffs on Mr. Marrufo and Mr. Marrufo's sustainment of injuries while he lied on the ground. An officer meets the Fourth Amendment standard to reasonably provide for a suspect's medical care so long as he promptly summons or transports the suspect to a care provider. *See Tatum*, 441 F.3d at 1099; *e.g.*, *Krause v. Cnty. of Mohave*, 846 Fed. Appx. 569, 571 (9th Cir. 2021) ("The district court correctly granted summary judgment on Plaintiff's denial of medical care claim because the officers fulfilled their due process obligation by calling for medical assistance within one minute of Krause being

shot."). Indeed, because the Officers promptly summoned medical care, Plaintiffs' contention that they violated their constitutional obligations in failing to provide proper medical care for Mr. Marrufo while waiting for paramedics to arrive is without merit. And as noted above, Plaintiffs do not provide any evidence or point to any expert testimony that the Officers' conduct in any way interfered with or delayed in Mr. Marrufo's access to medical care or that his death was caused by any delay or conduct on part of the Officers. Indeed, Dr. Carpenter did not render any opinion in the autopsy report or in his deposition that any delay in medical treatment caused or contributed to Mr. Marrufo's death. PRDSF ¶ 42; *see Harper*, 533 F.3d at 1026 ("In a § 1983 action, the plaintiff must also demonstrate that the defendant's conduct was the actionable cause of the claimed injury. … To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation."). Therefore, Defendants are entitled to summary judgment on the merits of this claim.

4.    <u>Analysis – Qualified Immunity</u>

Even if a jury could and did find that Officers Rodriguez and Zamora's actions were not objectively reasonable under the Fourth Amendment, the Officers would be shielded from liability on Plaintiffs' claim for failure to provide medical care under the doctrine of qualified immunity.

As applied here, to defeat Defendants' claim to qualified immunity, Plaintiffs must identify controlling authority establishing that the alleged misconduct during and after Officer Rodriguez summoned medical care clearly violated Decedent's constitutional right to be free from unreasonably denied or delayed medical care such that any reasonable officer would have perceived the unlawfulness. Plaintiffs fail to meet this burden because they have not identified any controlling and applicable authority for any such proposition. *See* (Doc. 27 at 22-23).

Specifically, Plaintiffs' cite to *Tatum*, but that case plainly does not present analogous facts and Plaintiffs present no argument for how that decision would put Defendants on fair notice that their actions of summoning medical care and turning Mr. Marrufo on his side and administering sternum rubs and chest compressions until paramedics arrived was unlawful. Similarly, Plaintiffs' citation to *Maddox* without any argument other than to note the holding that "due process requires

27

officers to seek medical attention for injured detainees" does not clearly establish that the Officers' conduct here violated any right of Mr. Marrufo.

In *D'Braunstein*, the Ninth Circuit held that it is clearly established that officers must seek to provide an injured detainee or arrestee with objectively reasonable medical care in the face of medical necessity creating a substantial and obvious risk of serious harm, including by summoning medical assistance. *D'Braunstein*, 131 F.4th at 771. The Ninth Circuit found that an officer's failure to secure medical aid for a plaintiff for several hours or to take the injured plaintiff to a hospital presented a substantial risk of serious harm such that the officer's conduct was objectively unreasonable and could result in further significant injury of the plaintiff. *Id.* at 770. Plaintiffs' reliance on *D'Braunstein*, arguing only that Officers Rodriguez and Zamora "failed to provide adequate medical care after Mr. Marrufo struck his head and became unresponsive[,]" does not satisfy Plaintiffs' burden of showing that the rights of Mr. Marrufo allegedly violated were clearly established. *See Shafer*, 868 F.3d at 1118 ("Because Shafer fails to identify sufficiently specific constitutional precedents to alert Deputy Padilla that his particular conduct was unlawful, Deputy Padilla is entitled to qualified immunity."). Indeed, Plaintiffs fail to explain how the instant case is obvious under or analogous to the facts of *D'Braunstein* such that Officers Rodriguez and Zamora are put on fair notice that their actions in summoning medical care within minutes of Mr. Marrufo's injury was unlawful.

Thus, because Plaintiffs have not carried their burden of identifying existing precedent that "'squarely governs' the specific facts at issue," Defendants are entitled to qualified immunity. *See Rosenbaum*, 107 F.4th at 924 (quoting *White*, 580 U.S. at 79).

**D.      Fourteenth Amendment Interference with Familial Relationship Claim**

1.      Parties' Contentions

Defendants contend there is no evidence from which this Court could conclude that Defendants violated Plaintiffs' Fourteenth Amendment rights. (Doc. 21-1 at 21). Defendants argue that any use of force and any conduct relative to Mr. Marrufo's medical care was reasonable such that Plaintiffs' Fourteenth Amendment claim fails. *Id.* at 22. Defendants assert that under the purpose to harm standard, there is no evidence that either Officer acted with the requisite purpose

28

to harm Decedent unrelated to legitimate law enforcement objectives. *Id.* at 23. Defendants further assert that because Plaintiffs fail to establish that Defendants committed a constitutional violation and that the violation caused Decedent's death, Plaintiffs fail to assert a claim under the Fourteenth Amendment for interference with familial relationship. *Id.* at 23-24.

Plaintiffs contend that there is sufficient evidence for a trier of fact to conclude that Officers Rodriguez and Zamora acted with deliberate indifference to a substantial risk or serious harm to Decedent. (Doc. 27 at 20). Plaintiffs argue that even under the purpose to harm standard, a reasonable juror could find that the Officer Defendants intended to harm Decedent. *Id.* at 20-21.

2.    Governing Authority

The Fourteenth Amendment protects liberty interests in the companionship between parents and children. "Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062 (9th Cir. 2013). "Only official conduct that shocks the conscience is cognizable as a due process violation." *Id.* (citations and quotations omitted). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Hayes*, 736 F.3d at 1230. "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.*

3.    Analysis

Here, Plaintiffs' claims of interference with familial relationship fail for the same reasons as noted above. Plaintiffs have failed to present any triable issue of fact as to the existence of any underlying constitutional violation such that Plaintiffs' claims for interference with familial relationship fail as a matter of law. *See Schwarz v. Lassen Cnty. ex rel. Lassen Cnty. Jail*, 628 Fed. Appx. 527, 528 (9th Cir. 2016) ("Recovery for a violation of the right to familial association is generally contingent on the existence of an underlying constitutional violation. Therefore, because there is no evidence that either Undersheriff Mineau or Lassen County was deliberately indifferent to Parker's serious medical needs, Schwarz's claim for loss of familial association—which is

predicated on their purportedly unconstitutional care of Parker—likewise fails as a matter of law.") (internal citation omitted); *J.P. ex rel. Balderas v. City of Porterville*, 801 F. Supp. 2d 965, 988-89 (E.D. Cal. 2011) ("Where a claim for interference with familial relationships is integrally predicated upon, or entwined with, other conduct that is alleged to be unconstitutional, a finding that the other conduct was constitutional generally will preclude recovery for interference with familial relationship.").

### E.    *Monell* Claim

#### 1.    Parties' Contentions

Defendants argue that Plaintiffs' claims seeking municipal liability fail because Officers Rodriguez and Zamora did not violate Plaintiffs' constitutional rights.  (Doc. 21-1 at 26). Defendants contend that even if the Court found a triable issue of material fact that Plaintiffs' constitutional rights had been violated, Plaintiffs fail to adduce evidence of a widespread custom, practice, or policy nor any evidence supporting a claim for inadequate training, as required under *Monell*.  *Id.* at 27-29.

Plaintiffs assert that genuine issues of material fact exist regarding Defendants' unlawful policies, customs, and practices to preclude summary judgment under *Monell*.  (Doc. 27 at 23). Plaintiffs contend they have sufficient evidence to establish "widespread and long-lasting policies, customs and practices of City and BPD," relying on various statistics of a 2023 report regarding public complaints of BPD.  *Id.* at 23-24.

#### 2.    Governing Authority

Pursuant to *Monell*, a "local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694.  Instead, the local government "is subject to suit under § 1983 only 'if it is alleged to have caused a constitutional tort through a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers.'"  *Gravelet-Blondin v. Shelton,* 728 F.3d 1086, 1096-97 (9th Cir. 2013) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)).  To establish a municipality's liability under *Monell*, a plaintiff "must show that (1) she was deprived of a constitutional right; (2) the [municipality] had a policy; (3) the policy amounted to a deliberate indifference to her

30

constitutional right; and (4) the policy was the moving force behind the constitutional violation." *Harmon v. City of Pocatello*, 854 Fed. App'x 850, 854 (9th Cir. 2021) (quoting *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001)). "The Supreme Court has made clear that policies can include written policies, unwritten customs and practices, failure to train municipal employees on avoiding certain obvious constitutional violations, and in rare instances, single constitutional violations are so inconsistent with constitutional rights that even such a single instance indicates at least deliberate indifference of the municipality." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (internal and concluding citation omitted).

Regarding a failure to train, mere negligence in a municipal entity's training of its employees is not enough. "To allege a failure to train, a plaintiff must include sufficient facts to support a reasonable inference (1) of a constitutional violation; (2) of a municipal training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees." *Id.* (citing *Blankenhorn*, 485 F.3d at 484).

### 3.   Analysis

Here, as discussed *supra*, Plaintiffs have failed to present facts sufficient to allow a reasonably jury to find a constitutional violation and, as such, Plaintiffs' *Monell* claims fail. However, even if Plaintiffs had presented such facts regarding an underlying constitutional violation, Plaintiffs fail to present any issue of fact as to the existence of a custom, practice, or policy relating to excessive force, failure to summon medical care, or failure to train.

In support of establishing the existence of a policy, Plaintiffs rely on various statistics from a 2023 Personnel Complaint Annual Review of BPD. PRDSF ¶ 32. However, as noted above, Plaintiffs do not cite to any expert testimony to support their characterizations of the statistics asserted nor any facts showing a pattern of constitutional violations arising from a custom, practice, or policy. Therefore, Plaintiffs fail to present any issue of fact to support a *Monell* claim.

Accordingly, Plaintiffs' municipal liability claims against the City of Bakersfield for unconstitutional custom, practice, or policy and failure to train fail. *See Hutton v. City of Berkeley*

*Police Dep't*, No. 13-cv-03407-JCS, 2014 WL 4674295, at *14 (N.D. Cal. Sept. 9, 2014) ("In this case, Plaintiff has not offered any evidence showing a pattern of constitutional violations. Rather, the only evidence in the record relates to the alleged unconstitutional acts in this case. Such evidence does not suffice to establish *Monell* liability."); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."); *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir. 1989) ("Davis has failed to establish that there is a genuine issue of material fact regarding the existence of a policy of inadequate training, inadequate medical treatment of prisoners, or deliberate indifference to the use of excessive force. A plaintiff cannot prove the existence of a municipal policy or custom based solely on the occurrence of a single incident of unconstitutional action by a non-policymaking employee.").

### F.     State Law Claims

In light of the foregoing analysis warranting the grant of Defendants' motion and dismissal of all section 1983 claims, the remaining claims in this action all are brought pursuant to state law. The Court may decline supplemental jurisdiction over state law causes of action under 28 U.S.C. § 1367(c) if "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). "While discretion to decline to exercise supplemental jurisdiction over state law claims is triggered by the presence of one of the conditions in § 1367(c), it is informed by the … values of economy, convenience, fairness, and comity." *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1999). The Ninth Circuit has "frequently recognized that when federal claims are dismissed before trial, supplemental state claims should ordinarily also be dismissed." *Avelar v. Youth And Fam. Enrichment Servs.*, 364 Fed. Appx. 358, 359 (9th Cir. 2010) (citing, *inter alia*, *Jones v. Cmty. Redevelopment Agency of City of Los Angeles*, 733 F.2d 646, 651 (9th Cir. 1984)).

Here, the Court has resolved all of the federal claims over which it has original jurisdiction. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). While the Court recognizes that litigation of a new suit places a burden on Plaintiffs, Plaintiffs make no showing to warrant this Court retaining jurisdiction over state law claims. *See* (Doc. 27). The remaining claims rely only on state law and, thus, a state court is in a better position to address said issues. *See, e.g.*, *Est. of F.R. v. Cnty. of Yuba*, No. 2:23-cv-00846 WBS CKD, 2025 WL 1549104, at *7 (E.D. Cal. May 30, 2025) (declining supplemental jurisdiction after granting summary judgment for all federal claims).

Accordingly, the Court will decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims and they will be dismissed without prejudice.

## V.  **Conclusion and Order**

Accordingly, it is HEREBY ORDERED that:

1.  Defendants' motion for summary judgment (Doc. 21) is GRANTED.

2.  Plaintiffs' state law claims are DISMISSED without prejudice.

3.  The Clerk of the Court is DIRECTED to enter judgment in favor of Defendants, to vacate all remaining case management dates, and to CLOSE this case.

IT IS SO ORDERED.

Dated:    **March 19, 2026**

_____
UNITED STATES MAGISTRATE JUDGE